901 A.2d 229

**COMPTROLLER OF MARYLAND**

v.

**Janet M. MILLER.**

**No. 02505, Sept. Term, 2004.**

Court of Special Appeals of Maryland.

June 29, 2006.

322

Gerald Langbaum (John K. Barry, J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellant.

Lisa M. O'Mara Arnquist (Davis & Associates Law Offices, PA on the brief), Towson, for appellee.

Argued before DAVIS, HOLLANDER and LAWRENCE F. RODOWSKY, (Retired, specially assigned) JJ.

HOLLANDER, J.

This case arises out of a grievance filed by Janet M. Miller, appellee, against the Comptroller of Maryland (the "Comptroller"), appellant, concerning the Comptroller's method of computing compensable [1] work time when an employee travels from home directly to a remote work site, rather than to the regularly assigned office. Appellee claimed she was entitled to compensation for all of her travel time, without deducting the time normally spent commuting to the office. The Comptroller was of the view that appellee was not entitled to compensation for the time she would have otherwise spent commuting to work.

Appellee pursued her grievance at a contested case hearing conducted by an Administrative Law Judge (the "ALJ") at the Office of Administrative Hearings (the "OAH"). The ALJ concluded that the Comptroller's policy was arbitrary and unsupported by law. However, the ALJ "denied and dismissed" Ms. Miller's grievance because she failed to present evidence as to the remedy she sought. The Circuit Court for Baltimore City affirmed the ALJ's decision rejecting the Comptroller's policy, but remanded the matter to OAH to determine the specific relief to which Ms. Miller was entitled.

On appeal, the Comptroller asks:

---

1. The parties refer interchangeably to "compensable time" and to "compensatory time." We assume the parties mean additional monetary compensation for the time at issue in this case, rather than extra time off from work.

Did the circuit court err in affirming the OAH decision that an employee temporarily assigned to a remote work site may properly treat as compensable work time the amount of time involved in her normal commute from home to assigned office?

For the reasons that follow, we shall reverse and remand.

## FACTUAL AND PROCEDURAL SUMMARY[2]

Ms. Miller began working for the Comptroller in August 2001 as a Financial Compliance Auditor in the Field Audit Section of the Compliance Division. At the time, it was the Comptroller's policy that an employee who was required to travel directly from home to a remote work site, without a stop at the employee's assigned office, would be entitled to compensable work time for travel only if the travel time exceeded by at least thirty minutes the employee's normal commute time. Conversely, if the travel time was less than half an hour beyond the normal commute time, the employee would not be compensated.

Ms. Miller testified at the OAH that, when she submitted her application for employment with the Comptroller, she indicated that she wanted to work within a reasonable commuting distance of her home. She explained, "I didn't want excessive commute time." According to Ms. Miller, her normal commute time from her home to her assigned office is "half an hour." About thirty days after appellee commenced working for the Comptroller, she began going on field audits, which required travel to remote sites.

In August 2003, Ms. Miller met with Phillip Deitchman, a labor relations specialist with the Maryland Classified Employee Association. According to Ms. Miller, they discussed the issue of compensation for off-site travel, and Mr. Deitch-

---

2. In its brief, appellant points out that "the essential facts were undisputed," and it "adopts the Findings of Fact as made by the ALJ." Given the procedural posture of this case, we have adduced the facts from the hearing held by the ALJ on April 20, 2004.

man informed her, "They're supposed to pay you the moment you leave home to when you return."

Accordingly, Ms. Miller submitted a grievance to the Comptroller, dated August 7, 2003, alleging that she was "not compensated properly for travel between her home and temporary work location, which was different from her normal assigned office." Further, the grievance stated: "Management's action is arbitrary, capricious, and has no factual basis." Appellee sought payment "for all time traveled between home and temporary work location."

In connection with the first step of the grievance process, Linda Tanton, the Director of the Compliance Division, issued a decision on September 12, 2003.[3] Ms. Tanton sustained the grievance, in part; she authorized compensation for all travel time in excess of Ms. Miller's normal commute time, even if the excess travel time did not exceed the normal commute time by thirty minutes. However, Ms. Tanton limited appellee's award to the period of thirty days prior to the filing of the grievance.

On September 24, 2003, twelve days after the first step decision, the Comptroller formally changed the policy for compensation for travel time. Under the revised policy, an employee is considered to be on work time for any time in excess of the employee's "normal one-way commute time."

Nevertheless, Ms. Miller appealed the decision because it did not deem as compensable work time the entire period of travel from the employee's home to a temporary work site. She also challenged the decision to limit the award to the preceding thirty days.

The second step of appellee's grievance, "Employee Petition Of Grievance Appeal," led to a "Management Decision" by Deputy Comptroller Stephen M. Cordi, dated November 12, 2003. He affirmed Ms. Tanton's decision regarding the work

---

**3.** The first step grievance decision is not part of the OAH record. But, it is referred to in the second step, the November 12, 2003 "Management Decision," which is part of the record.

time policy. However, pursuant to Maryland Code (1993, 2004 Repl.Vol., 2005 Supp.), § 12–203(b) of the State Personnel and Pensions Article ("S.P.P."), Cordi modified the award to limit compensation to the twenty-day period preceding the filing of the grievance on August 7, 2003. Cordi explained:

In support of the request for a longer period of award, Ms. Miller's representative has directed my attention to a case involving two inspectors of the Department of Labor, Licensing and Regulation in which the Circuit Court for Baltimore City overruled an Administrative Law Judge's award of 30 days compensation in a commuting compensation case and award of 5 years. In an unreported decision, the Court of Special Appeals vacated the circuit court decision and remanded the case to the Administrative Law Judge to put the reason for limiting the award to 30 days on the record. Shortly thereafter, the Administrative Law Judge issued a decision specifying that the award was limited to 30 days because Section 10–206 of the State Personnel and Pensions Article, in effect at the time of the grievances in question, specified that grievances must be filed within 30 days of the act generating the grievance or when the grievant first knew or should have known of the act generating the grievance.

After the filing of the grievances in the foregoing case, the General Assembly replaced Section 10–206 with Section 12–203(b) which provides as follows:

A grievance procedure must be initiated by an employee within 20 days after: (1) the occurrence of the alleged act that is the basis of the grievance; or (2) the employee first knew of or reasonably should have known of the alleged act that is the basis of the grievance.

In light of the foregoing, Ms. Tanton's award is hereby modified to conform with the 20–day requirement of Section 12–203(b).

As to the substance of the grievance, that is whether Ms. Miller is entitled to compensation for the time for all of her travel to temporary work locations or just the time in excess of normal commute time, Ms. Tanton ruled as follows:

An employee is entitled to compensation during work time. Pursuant to COMAR 17.04.11.02B(1)(j), "work time includes time during which an employee ... [t]ravels between home and the work site other than the assigned office, in accordance with the Standard Travel Regulations under COMAR 23.02.01." I believe that the Department of Budget and Management, in adopting this definition of work time, is equating the determination of what is and is not work time, contrasted with commute time, to the similar determination made by the Board of Public Works in its Standard Travel Regulations.

The travel regulations provide that reimbursement for State-owned, State-leased, and privately-owned vehicles is subject to policies issued by the Department of Budget and Management, which has adopted "State Vehicle Fleet Policies and Procedures." As most recently adopted in June 2002, Section 5 of that document sets forth the policy regarding private mileage reimbursement. Paragraph 5.01.05 states that:

"Reimbursement is based on the principle that the employee should be reimbursed for all official business mileage accumulated in a private vehicle which is beyond the normal round trip mileage incurred from the employee's home to the permanently assigned office/work station and back home again."

Paragraph 5.01.01(1) further provides:

"A State employee who leaves home to conduct business without stopping at the assigned office may be reimbursed for all mileage directly connected with the business trip, which is in excess of the commute miles normally traveled, i.e., total official miles driven minus normal daily commute miles. In this situation, the driver has not driven his normal daily commute and therefore must subtract it from the total official miles driven."

I believe that COMAR 17.04.11.02B(1)(j), incorporating the Standard Travel Regulations, is intending to apply the quoted mileage reimbursement concept in determining whether an employee is on work time or commute time.

Applying that concept to this situation, for those days when Ms. Miller does not travel to her assigned office, she would properly be viewed as being on work time for all time directly connected with the business trip, in excess of her normal commute time.

Having reviewed the regulations in question, I have concluded that Ms. Tanton's analysis is correct and thereby adopt her decision. That decision has the effect of providing parallel treatment for office and field personnel and avoids the necessity of management having to require field employees to report to the office first (and last) whenever the audit site is closer to the office than the employee's home.

The award is modified as set forth above, but the grievance is otherwise denied.

Unhappy with the outcome, Ms. Miller filed a third step appeal to the Secretary of the Department of Budget and Management (the "DBM"), who delegated the case to the OAH. The ALJ conducted an evidentiary hearing on April 20, 2004, at which Ms. Miller testified. James Loftus, Assistant Director of the Comptroller's Compliance Division, testified on behalf of the agency.

Ms. Miller maintained that, if she was not traveling directly to her assigned office, she was "on the clock" from the moment she got in her vehicle until she arrived at the remote work site. Moreover, she claimed that the Comptroller's travel time policies, both before and after the revision of September 24, 2003, violated Code of Maryland Regulations ("COMAR") 17.04.11.02B(1)(j), which states: "Work time includes time during which an employee ... [t]ravels between home and the work site other than the assigned office, in accordance with the Standard Travel Regulations under COMAR 23.02.01."

Nevertheless, Ms. Miller conceded that, under the interpretation she advanced, she would earn compensable time even if assigned to a remote work site that required less travel time than her regular commute to her assigned office. In particular, she maintained that if, as a result of a work assignment to

a remote location, she had only a fifteen minute drive to the remote work site instead of her normal commute of thirty minutes from home to office, she would earn compensable time of thirty minutes for a round trip. Yet, she acknowledged that she earned no compensatory time for the entirety of her normal thirty minute home-to-office commute.[4]

The following exchange is pertinent:

[ASSISTANT ATTORNEY GENERAL]: So you would be asserting your right to compensatory time of 30 minutes in this hypothetical when your overall work day from beginning to end was in fact a half an hour shorter than your normal work day, is that correct?

[MILLER]: That's correct.

Ms. Miller described how she learned of the Comptroller's initial policy:

I had asked specifically my supervisor what the travel policy was and he handed me that memo, and I said, "Well, I have an audit," and I said, "If I go on that beltway in the morning, I've sat in traffic to go one mile and wait—and sat for 25 minutes."

I said, "I have to meet—my manager's supposed to be at this tax site at 8:30," and I now want to leave a quarter after 7:00, which with a half-an-hour commute would give me the extra half and [sic] hour plus 15 minutes. So I would have gotten under the old policy, the—the memo indicated, 45 minutes compensatory time, and my supervisor said, "Okay." That Monday I left home at quarter after 7:00 to meet. The beltway was tied up, it was snowing and I got to the taxpayer's site at 25 of 9:00. I thought my timing was pretty good on doing that.

The next day I went into the office and I asked my supervisor how to put the time down on the time card,

---

4. Ms. Miller did not submit any time sheets or other documentation showing the time for which she was not compensated. Mr. Deitchman later explained that Ms. Miller's intention was to submit time sheets to management and payroll after the ruling.

because they wouldn't pay me for when I left home, they were going to discount that first half hour, and he said, "I'll have to get back to you." Well, time cards weren't due until the next week, no big deal as far as I was concerned.

The following Tuesday time cards are due and he says, "Where's your time card," and I—I reminded him he was going to get back and tell me what hours to put in and then he told me they weren't going to pay me, they weren't approving compensatory time.

The Comptroller argued that Ms. Miller's position could lead to the "absurd" result of an employee who normally commutes thirty minutes at both ends of the day obtaining compensation for fifteen minute trips at each end of the day, and yet "putting in a 30–minute shorter day." Moreover, the Comptroller claimed that, even if its current policy is inconsistent with law, S.P.P. § 12–203(b) limits to twenty days its liability for back pay or compensation.

Appellant advanced the position expressed by Mr. Cordi in his "Management Decision" dated November 12, 2003. The Comptroller conceded that its policy prior to September 24, 2003, was incorrect and inconsistent with the law, but asserted that its revised travel time policy was correct under COMAR 17.04.11.02B(1)(j).

Loftus testified that the Comptroller's revised work time policy was based upon the mileage reimbursement policy that already applied to State employees. He explained that, under the revised policy, if an employee with a normal commute time of thirty minutes were assigned to a remote work site located fifteen minutes from the employee's home, that fifteen minute trip "would be all commute time, no work time." The same result would occur if the employee with a normal commute of thirty minutes was assigned a remote work site thirty minutes from home. However, if the employee with a normal commute time of thirty minutes was assigned to a remote work site forty-five minutes or ninety minutes from home, the employee

would be paid for fifteen minutes or one hour, respectively.[5]

The Comptroller introduced a letter of February 8, 2000, from Andrea M. Fulton, Executive Director of the Office of Personnel Services and Benefits within DBM, to Mr. J. Alan Baker, Director of the Personal Services Administration of the Department of Health and Mental Hygiene. It stated, in part:

> In accordance with Code of Maryland Regulation (COMAR) 17.04.011.02B(1)(j), any time that an employee travels between home and a work site other than the assigned office is considered work time. When such situations occur, we believe it is appropriate to deduct the employee's normal commute time from the actual travel time. The amount of the employee's actual travel time that exceeds the employee's normal commute time should be considered work time and the employee should be compensated, as appropriate under the personnel regulations concerning overtime, for this time.

On June 4, 2004, the ALJ issued his decision, concluding, in part, that the Comptroller's revised policy "is arbitrary and inconsistent with law and regulations." He reasoned:

> No statute directly addresses how executive branch agencies are to define, and compensate employees for, "work time," "commute time" or "travel time." [COMAR 17.04.11.02B(j) provides, "Work time includes time during which an employee ... [t]ravels between home and the work site other than the assigned office, in accordance with the Standard Travel Regulations under COMAR 23.02.01."]

The Board of Public Work's Standard Travel Regulations apply to all executive branch State employees. COMAR 23.02.01.02B(14) provides as follows:

> (14) "Travel status" means the condition of a State employee while traveling on State business. An employee is not in travel status while commuting from home to the

_____

5. This assumes the actual work time is not reduced downward to account for the extra travel time.

employee's assigned office, regardless of the length of time of that commute.

Thus, by promulgated regulation, it is the policy of all executive agencies in the State (unless otherwise exempted) that an employee traveling from home to a field site, and not to the employee's assigned office, is on "work time" and in "travel status." An employee is to be paid or compensated for "work time." *See,* COMAR 17.04.11.02B(1)(a) through (*l*) (list of instances that qualify as compensable work time). When traveling to a field site, an employee is working for the State, "on the clock" so to speak, from the time the employee leaves the residence or the place from which the normal commute to the assigned office would begin.

In the instant case, under its revised policy (Joint Ex. # 2) the Agency automatically, subtracts out (refuses to compensate for) time equal to an employee's normal, estimated commute time from home to the employee's assigned office and back home again when the employee travels to a field site. The Agency argues that the policy is analogous to the Private Mileage Reimbursement policy contained in the Department of Budget and Management's Vehicle Fleet policy (Joint Ex. # 3, p. 17–18). That policy is one in which mileage equal to an estimated, average round trip commute to an assigned office is subtracted out of the total miles traveled to and from a field site, for purposes of reimbursing an employee who uses a personal automobile for travel to a field site. With regard to reimbursing travel time, the Agency currently subtracts out the estimated, round trip travel time to the assigned office on those days when an employee does not commute to the employee's assigned office.

. . . . There is no direct legal authority to allow the Agency to deduct from an employee compensation for the work time while on travel status. Moreover, if an employee has two or more residences, or two or more places from which an estimated commute to the assigned office begins, the automatic deduction policy becomes unmanageable. The Agen-

cy attempted to argue that if the travel time to a field site were shorter than the estimated commute time to the assigned office, then the employee would somehow be unjustly compensated and therefore that interpretation of the law and regulations would lead to an absurd result. I am not persuaded by the agency's argument on that point. I conclude that [Ms. Miller] has met her burdens to show that the Agency misapplied the statewide policy in formulating its own travel time policy.

Nevertheless, the ALJ said:

In the instant case, [Ms. Miller] offered no credible evidence regarding the calculation of uncompensated work hours that she alleges were wrongly denied by the Agency. She has not offered evidence of the extent, if any, of uncompensated work hours.

The ALJ concluded:

Based upon the foregoing Findings of Fact and Discussion, I conclude, as a matter of law, that [Ms. Miller] demonstrated that the Agency's revised travel time policy did not conform to law and regulation. COMAR 17.04.11.02. I further conclude, however, that [Ms. Miller] did not meet her burdens with regard to demonstrating that she is entitled to compensation for certain, uncompensated work time. Md.Code Ann. State Pers. & Pens. § 12–401(2).

Although the ALJ rejected the Comptroller's arguments on the merits, he "denied and dismissed" the grievance, because Ms. Miller had not presented evidence regarding the remedy she sought. Thereafter, Ms. Miller petitioned for judicial review, and the Comptroller cross-petitioned. The circuit court agreed with the ALJ that the Comptroller's revised policy was not supported by law. On the question of remedies, however, the court remanded the case to OAH

for further proceedings to determine what, if any, compensation should be awarded Petitioner Miller for travel she undertook to any remote work site. Consistent with all

other aspects of the decision of the Administrative Law Judge, Petitioner Miller's grievance will be granted.

We shall include additional facts in our discussion.

## DISCUSSION

### I.

Before discussing the parties' contentions, it is helpful to review the pertinent statutory and regulatory provisions.

Title 17 of COMAR is captioned "Department of Budget and Management." Subtitle 04 is titled "Personnel Services and Benefits." Chapter 11 pertains to "Leave." Section 02 of Chapter 11 is titled "Workweek, Overtime and Compensatory Time." COMAR 17.04.11.02B states:

B. Work Time.

(1) Work time includes time during which an employee:

(a) Is on duty, whether at the employee's principal job site or at a remote location as part of the State's telecommuting program;

(b) Is on paid leave;

(c) Participates in training activities as a job assignment;

(d) Is on the employer's premises and is on call and waiting for work;

(e) Is not on the employer's premises, but is on call and waiting for work, and the employee's personal activities are substantially restricted;

(f) Is changing into and removing program-specified clothing and equipment necessary for the performance of the job;

(g) Participates in activities that are *job-related* immediately before the beginning or immediately after the end of an assigned shift;

(h) Travels to and from work after being recalled to work by the appointing authority or the appointing authority's

designated representative after the employee has completed the standard workday;

(i) Travels to and from work after being called to work by the appointing authority or the appointing authority's designated representative on the employee's scheduled day off if the employee works fewer than 8 hours as a result of being called on the employee's scheduled day off;

(j) Travels between home and a work site other than the assigned office, in accordance with the Standard Travel Regulations under *COMAR 23.02.01;*

(k) With prior supervisory approval, investigates and processes a disciplinary appeal or grievance, and participates at any conference or hearing relating to a grievance or appeal, in accordance with COMAR 17.04.07.07; or

(*l*) With prior supervisory approval, uses reasonable time to investigate and process a complaint under State Personnel and Pensions Article, Title 5, Annotated Code of Maryland.

(2) Work time includes any other time defined as work time under the Fair Labor Standards Act (FLSA), if applicable.

(Emphasis added.)

Title 23 of COMAR is captioned "Board of Public Works." Subtitle 02 is titled "Program Administration." Chapter 01 contains the "Standard Travel Regulations." COMAR 23.02.01.01 states:

.01 **Scope.**

A. Unless otherwise provided by law, these regulations apply to all travel for official business undertaken by officials and employees of units of the Executive Branch of the State government, except elected officials and officials and employees of the University of Maryland System.

B. If a contract specifically provides for their application, these regulations may apply to official business travel of persons performing a State contract.

C. *These regulations do not apply* :

(1) When a line item in the annual State budget specifically identifies an item and amount for exemption.

(2) To State-owned, State-leased, or privately owned motor vehicles. ***Reimbursement to employees or officials who use State-owned, State-leased, or privately owned motor vehicles to conduct official business for the State is within the jurisdiction of the State Fleet Administrator, Department of Budget and Management, and subject to policies issued by the Secretary of Budget and Management.***

(Emphasis added.)

COMAR 23.02.01.02 is also relevant. It provides:

.02 **Definitions.**

\* \* \*

B. Terms Defined.

\* \* \*

(5) Employee.

(a) "Employee" means an employee or official of a unit of the Executive Branch of State government.

\* \* \*

(10) "Routine business travel" means authorized travel on a daily basis or periodic basis to a jobsite other than the employee's assigned office for official business.

\* \* \*

(14) "Travel status" means the condition of a State employee while traveling on State business. *An employee is not in travel status while commuting from home to the employee's assigned office,* regardless of the length of time of that commute.

(Emphasis added.)

Part 5.0 of the State Fleet Administrator's "State Vehicle Fleet Policies and Procedures" addresses mileage reimbursement. Section 5.01.05, "Reimbursable Mileage," states:

Reimbursement is based on the principle that the employee should be reimbursed for all official business mileage accumulated in a private vehicle which is beyond the normal round trip mileage incurred from the employee's home to the permanently assigned office/work station and back home again.

Section 5.01.05 further provides:

A State employee who leaves home to conduct business without stopping at the assigned office may be reimbursed for all mileage directly connected with the business trip, which is in excess of the commute miles normally traveled i.e. total official miles driven minus normal daily commute miles. In this situation, the driver has not driven his normal daily commute and therefore must subtract it from the total official miles driven.

Title 8 of the S.P.P. Article is captioned "COMPENSATION OF EMPLOYEES SUBJECT TO SALARY AUTHORITY OF SECRETARY OF BUDGET AND MANAGEMENT." Tile 8, Subtitle 3, is captioned *"Overtime Compensation."* S.P.P. § 8–302, **"Construction and entitlement,"** provides:

(a) *Construction of Subtitle.*—This subtitle [Overtime Compensation] shall be interpreted and applied, to the extent applicable, in accordance with the Federal Fair Labor Standards Act;

(b) *Entitlement.*—All employees subject to this subtitle are *entitled to the greater of:*

(1) The benefits that are provided in this subtitle; or

(2) To the extent applicable, the benefits required by the federal Fair Labor Standards Act.

(Emphasis added.) [6]

S.P.P. § 12–203(b) states:

(b) *Time limitations.*—A grievance procedure must be initiated by an employee within 20 days after:

---

6. Appellee did not rely below on the Fair Labor Standards Act ("FLSA"), and does not argue before this Court that the Comptroller's revised policy fails to comply with FLSA.

(1) the occurrence of the alleged act that is the basis of the grievance; or

(2) the employee first knew of or reasonably should have known of the alleged act that is the basis of the grievance.

S.P.P. § 12–402(a), "Remedies available to grievants," provides:

(a) *In general.*—Except as provided in subsection (b) of this section, the remedies available to a grievant under this title are limited to the restoration of the rights, pay, status, or benefits that the grievant otherwise would have had if the contested policy, procedure, or regulation had been applied appropriately as determined by the final decision maker. . . .

## II.

The Comptroller contends that its revised travel policy is valid because it provides for compensation to employees for time actually worked, while denying compensation for the time it ordinarily takes the employee to commute between home and office. Appellant states:

This policy equates compensation for persons working at a remote work site with compensation for persons working at an assigned office; equates the State's work time policy with the State's travel reimbursement policy; is logical; and is fair. It avoids a windfall to employees assigned to a remote work site located closer to their homes than their assigned office and is consistent with federal law.

Appellant notes that COMAR 23.02.01 contains regulations adopted by the Board of Public Works regarding travel for official business. (y.10) According to the Comptroller, "work time," as defined under COMAR 17.04.11.02B(1)(j), comports "with the Standard Travel Regulations under COMAR 23.02.01." Therefore, asserts appellant, "by express regulation" DMB "has adopted the criteria for determining what is and is not reimbursable business mileage, as set forth in the State's Standard Travel Regulations, as the criteria to be used in determining work time." The Comptroller adds that, "[w]ere this not so, the phrase in COMAR 17.04.11.02B(1)(j)

'in accordance with COMAR 23.02.01' would be mere surplusage. . . ."

The Comptroller points out that COMAR 23.02.01.01C(2) provides that the travel regulations do not apply to "State-owned, State-leased, or privately owned motor vehicles [used] to conduct official business for the State." Rather, "[r]eimbursement to employees or officials who use State-owned, State-leased, or privately owned motor vehicles to conduct official business for the State is within the jurisdiction of the State Fleet Administrator, Department of Budget and Fiscal Planning [now DBM], and subject to policies issued by the Secretary. . . ." Accordingly, appellant contends that "DBM's incorporation of the Board of Public Works' travel policy in turn adopts the policies established by the State Fleet Administrator."

Appellant underscores that "[t]he rule for mileage reimbursement, which DBM has adopted for defining work time, is clear: the time it takes to commute from home to the assigned office is personal time and must be subtracted out." In its view,

> DMB's own regulation, COMAR 17.04.11.02B(1)(j), through an incorporation by reference, adopts the State Fleet Policy as the basis for determining work time. Thus, the Comptroller's revised policy, based as it is on DBM's State Fleet Policy, is derived directly from DBM's own definition of work time. That definition requires that the home to assigned office commute segment of each trip be subtracted from the total travel time to determine compensable "work time."

According to appellant, its interpretation of the work time policy is logical and consistent with the DBM Fleet Policy; both policies recognize that travel time from home to the assigned office "is personal, and not compensable as work-related." Appellant suggests that, "to hold otherwise would create several anomalies and absurdities of the type that courts regularly caution should be avoided." In appellant's view, the revised policy "avoids an unwarranted windfall when

an employee is assigned to a remote work site that involves a commute that is shorter than the normal drive to the assigned office." Appellee's position, argues the Comptroller, could lead to the "inappropriate" result of "an auditor [having] earned 30 minutes of compensatory time—*for putting in a 30 minute shorter day.*" Appellant asserts: "Disparate treatment of similar components of the same trip makes no sense. This is particularly true where, as here, the rule for computing work time is based on the rule for computing business mileage reimbursement."

Moreover, appellant insists that its interpretation "is consistent with the views of DBM." Referring to the letter of February 8, 2000, from DBM Executive Director Fulton,[7] appellant maintains that "these interpretations, by the official charged with administering the provisions in question," should receive " 'a great deal of deference.' " (Citation omitted.)

In addition, appellant relies by analogy on 29 U.S.C. § 254(a), which provides that an employer is not subject to liability or required to pay overtime under the Fair Labor Standards Act of 1938 ("FLSA") for activities that are "preliminary or postliminary" to principal activities.

Finally, appellant contends that, under S.P.P. § 12–203(b), the maximum relief to which appellee is entitled is limited to the period of twenty days prior to her filing of the grievance on August 7, 2003. Appellant explains:

> The filing of a grievance on August 7, 2003, permits at most an award going back 20 days, but no further. Were this not the case, an employee could allow an erroneous (or illegal) management policy to continue, indefinitely, thus building up damages for the employee, while denying management the knowledge needed to fix the problem. The ALJ recognized this limit in his reference to "the twenty-day rule."

Appellee counters that the

---

7. As noted, Fulton stated, in part: "[W]e believe it is appropriate to deduct the employee's normal commute time from the actual travel time."

ALJ was correct in his interpretation of the law relative to the substantive issue presented in the Appellee's grievance: Whether the law requires the employee to be compensated for **all** of the time she spends traveling between her home and a work site other than her assigned office? The ALJ concluded that the answer to that question is yes. That conclusion was correct. . . .

Further, she asserts:

The plain language of the regulation requires that the Employee be compensated for the **entire** time spent traveling from home to a work site other than the assigned office. There is no support in the language of the regulation for the Comptroller's position that it is authorized to subtract **any** time from that travel time and deem it non-compensable.

Appellee relies on the definition of "travel status"[8] in COMAR 23.02.01.02(14), claiming an employee is traveling on State business when proceeding from home to a remote site other than the regularly assigned office. Appellee also asserts that COMAR 23.02.01.02(10), defining "routine business travel," supports her view, because it means "authorized travel" to "a jobsite other than the employee's assigned office for official business." According to appellee, "the logical, and correct, interpretation of these regulations" means that whenever an employee is in travel status, he or she is on work time, because the employee is engaged in "routine business travel" for the State. She adds that her interpretation comports with the plain meaning of the words used in the COMAR regulations.

Appellee also complains that the Comptroller relies not on COMAR 17.04.11.02B(1) and the Standard Travel Regulations, but upon a manual adopted by the State Fleet Administrator. According to appellee, the manual addresses the policies and

---

**8.** As noted, "travel status" is defined in COMAR 23.02.01.02(14) as "the condition of a State employee while traveling on State business. An employee is not in travel status while commuting from home to the employee's assigned office, regardless of the length of time of that commute."

procedures by which State employees may utilize vehicles from the State vehicle fleet or receive reimbursement for mileage if a personal vehicle is used for State business, but the manual does not pertain to compensable "work time." In appellee's view, the policy relied upon by the Comptroller "does not possess the force and effect of law" and, "[o]n its face, the policy ... has no application to the issue in this case."

Ms. Miller seems to recognize that "anomalies and absurdities" are created by compensating an employee "for work time under one regulation, while another policy does not afford the employee mileage reimbursement for the same trip." She states: "It may be true that this is an inconsistency that is not wise or appropriate." Nevertheless, appellee asserts:

That does not mean, however, that the appropriate way to remedy that inconsistency is to deprive the employee of the compensation she is clearly entitled to under COMAR, just because she may not be entitled to mileage reimbursement for the trip as well. It makes more sense to bring the mileage reimbursement policy into conformity with CO-MAR's definition of "work time," not the other way around. After all, properly promulgated COMAR regulations carry the force and effect of law. The policy manual relied upon by Appellant does not.

Moreover, appellee contends that appellant's reliance upon FLSA "is simply not the issue in this case," as it was not relied upon by the appellee in her claim or by the ALJ in his decision. She asserts: "Maryland law clearly contemplates that state employees will be entitled to compensation in a larger number of circumstances than are guaranteed by the FLSA."

Miller directs us to S.P.P. § 8–302 which led to the promulgation of COMAR 17.04.11.02.B. The statute states: "All employees subject to this subtitle are entitled to the greater of: (1) the benefits that are provided under this subtitle; or (2) to the extent applicable, the benefits required by the federal Fair Labor Standards Act." According to appellee,

"Maryland law does not simply mirror or 'codify' the requirements of the FLSA. Rather, there are circumstances in which state law goes beyond the FLSA...." In appellee's view, the Comptroller asks this Court to "simply ignore COMAR regulations ... which squarely resolve" the issue, and instead to "adopt a tortured and convoluted argument which essentially ignores controlling law directly on point, in favor of a policy manual which has no reasonable application to the issues or facts presented in this case."

Finally, appellee contends that the issue of whether her remedy is limited to compensation for twenty days is not properly before this Court, because in its "Question Presented" appellant "raises only the question of the correctness of the decision below on the legality of the Comptroller's revised work time policy." In any event, citing S.P.P. § 12–402(a), "**Remedies available to grievants**," which provides that the remedies available to a grievant under this title include "the restoration of the rights, pay, status, or benefits that the grievant otherwise would have had if the contested policy, procedure, or regulation had been applied appropriately as determined by the final decision maker," appellee contends that the law provides that employees who are successful through the grievance process are entitled to be made whole.

### III.

We review the decision of an administrative agency in accordance with the well-established principles of administrative law. *See, e.g., Maryland Aviation Administration v. Noland,* 386 Md. 556, 873 A.2d 1145 (2005); *Bd. of Physician Quality Assurance v. Mullan,* 381 Md. 157, 165, 848 A.2d 642 (2004); *Oltman v. Bd. of Physicians,* 162 Md.App. 457, 482, 875 A.2d 200 (2005). When an agency's determination is made by an ALJ, " '[t]he decision of the Office of Administrative Hearings is the final administrative decision.' " *Department of Public Safety and Correctional Services v. Palmer,* 389 Md. 443, 453–54, 886 A.2d 554 (2005) (quoting S.P.P. § 12–205(c)(2)(ii)). Accordingly, we review the ALJ's decision, not that of the circuit court.

**344**

■ When we review the decision of an administrative agency, our role is the same as that of the circuit court. *Capital Commercial Props., Inc. v. Montgomery County Planning Bd.*, 158 Md.App. 88, 95, 854 A.2d 283 (2004); *see also Stansbury v. Jones*, 372 Md. 172, 182, 812 A.2d 312 (2002); *Bd. of Physician Quality Assurance v. Banks*, 354 Md. 59, 68, 729 A.2d 376 (1999). As to an agency's final decision, we consider " '(1) the legality of the decision and (2) whether there was substantial evidence from the record as a whole to support the decision.' " *State Highway Admin. v. David A. Bramble, Inc.*, 351 Md. 226, 238, 717 A.2d 943 (1998) (citation omitted); *see also Total Audio–Visual Systems, Inc. v. Dep't of Labor*, 360 Md. 387, 394, 758 A.2d 124 (2000).

■ An agency's factual findings are binding upon a reviewing court, so long as they are supported by substantial evidence in the record. *United Parcel Serv., Inc. v. People's Counsel*, 336 Md. 569, 577, 650 A.2d 226 (1994). Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Bulluck v. Pelham Wood Apartments*, 283 Md. 505, 512, 390 A.2d 1119 (1978); *see Gigeous v. ECI*, 363 Md. 481, 497, 769 A.2d 912 (2001). In other words, the reviewing court must ask whether "reasoning minds could reach the same conclusion from the facts relied upon by the Board." *Dep't. of Labor v. Hider*, 349 Md. 71, 78, 706 A.2d 1073 (1998).

We then " 'determine if the administrative decision is premised upon an erroneous conclusion of law.' " *Noland*, 386 Md. at 571, 873 A.2d 1145 (citations omitted); *see also Board of Physicians v. Bernstein*, 167 Md.App. 714, 749, 894 A.2d 621 (2006); *Human Resources v. Howard*, 168 Md.App. 621, 633–34, 897 A.2d 904 (2006). The *Noland* Court explained:

> Even with regard to some legal issues, a degree of deference should often be accorded the position of the administrative agency. Thus, an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight

by reviewing courts. . . . Furthermore, the expertise of the agency in its own field should be respected.

386 Md. at 572, 873 A.2d 1145 (citations omitted). *See also Palmer*, 389 Md. at 453, 886 A.2d 554. "On the other hand," said the *Noland* Court, "when a statutory provision is entirely clear, with no ambiguity whatsoever, 'administrative constructions, no matter how well entrenched, are not given weight.' " 386 Md. at 572, 873 A.2d 1145

Courts have long recognized that it is within the power of agencies to enact regulations. As the Court said in *Comptroller of Treasury v. Rockhill, Inc.*, 205 Md. 226, 232–33, 107 A.2d 93 (1954):

It is universally recognized that it would be impossible for the Legislature to deal directly with the multitude of details in the complex conditions upon which it legislates, and so it has become customary for the Legislature to delegate to each administrative agency the power to make rules and regulations to carry legislation into effect. Unless an administrative officer or department is permitted to make reasonable rules and regulations, it would be impossible in many instances to apply and enforce the legislative enactments, and the good to be accomplished would be entirely lost.

*See also Christ v. Md. Dept. of Natural Resources*, 335 Md. 427, 644 A.2d 34 (1994); *Department of Transp. v. Armacost*, 311 Md. 64, 532 A.2d 1056 (1987).

At the same time, an agency's power to enact regulations is not without limits. " 'Legislation may not be enacted by an administrative agency under the guise of its exercise of the power to make rules and regulations by issuing a rule or regulation which is inconsistent or out of harmony with, or which alters, adds to, extends or enlarges, subverts, or impairs, limits, or restricts the act being administered.' " *Mayor of Baltimore v. William E. Koons, Inc.*, 270 Md. 231, 236–237, 310 A.2d 813 (1973) (citation omitted). Moreover, "regulations adopted by an administrative agency must be reasonable and

consistent with the letter and policy of the statute under which the agency acts." *Id.* at 237, 310 A.2d 813.

■ In general, an agency may enact rules that are either legislative or interpretive. " 'A legislative rule is the product of an exercise of delegated legislative power to make the law through rules. An interpretive rule is any rule an agency issues without exercising delegated legislative power to make law through rules.' " *Dep't. of Public Safety and Correctional Services v. Beard,* 142 Md.App. 283, 301, 790 A.2d 57 (quoting Davis, *Administrative Law Treatise,* Ch. 7, § 7.8 at 36 (1979)), *cert. denied,* 369 Md. 180, 798 A.2d 552 (2002). In *Board of School Comm'rs. v. James,* 96 Md.App. 401, 625 A.2d 361 (1993), we recognized that an administrative regulation is "legislative," so as to carry the force of law, if "it 'affects individual rights and obligations' and . . . the agency intended the rule to be legislative as 'evidenced by such circumstantial evidence as the formality that attended the making of the law, including rule making procedure and publication.' " *Id.* at 422, 625 A.2d 361 (quoting Peter Raven–Hansen, *Regulatory Estoppel: When Agencies Break Their Own "Laws,"* 64 Tex. Law Rev. 1, 16 (1985)); *see also Waverly Press, Inc. v. State Dept. of Assessments & Taxation,* 312 Md. 184, 191, 539 A.2d 223 (1988).

The regulatory provisions pertinent here are legislative in nature. Accordingly, they have the force of law.

In construing the regulatory provisions set forth previously, we are mindful that courts have generally applied the same rules of construction to both the interpretation of statutes and the interpretation of agency regulations. *Maryland Comm'n on Human Relations v. Bethlehem Steel,* 295 Md. 586, 592–93, 457 A.2d 1146 (1983); *Dorsey v. Beads,* 288 Md. 161, 176, 416 A.2d 739 (1980). Determining the meaning of a statute is a question of law, subject to *de novo* review. *Auction of Estate Representatives v. Ashton,* 354 Md. 333, 341, 731 A.2d 441 (1999); *Calomiris v. Woods,* 353 Md. 425, 434, 727 A.2d 358 (1989).

■ "Every quest to discover and give effect to the objectives of the legislature [or the agency] begins with the text of the statute." *Huffman v. State,* 356 Md. 622, 628, 741 A.2d 1088 (1999); *see In re: Victor B.,* 336 Md. 85, 94, 646 A.2d 1012 (1994). The language is the "primary source" to ascertain such intent. *State v. Pagano,* 341 Md. 129, 133, 669 A.2d 1339 (1996). In interpreting the text, we give the words "their ordinary and natural meaning." *Whack v. State,* 338 Md. 665, 672, 659 A.2d 1347 (1995); *see Lewis v. State,* 348 Md. 648, 653, 705 A.2d 1128 (1998). Generally, "[w]e neither add nor delete words to a clear and unambiguous statute [or regulation] to give it a meaning not reflected by the words ... or engage in a forced or subtle interpretation in an attempt to extend or limit the ... meaning." *Taylor v. NationsBank,* 365 Md. 166, 181, 776 A.2d 645 (2001); *see Mid–Atlantic Power Supply Assoc. v. Public Service Comm'n of Md.,* 361 Md. 196, 760 A.2d 1087 (2000). Rather, "if the language [of a regulation] is clear and unambiguous, there is usually no need to look further." *Gary v. State,* 341 Md. 513, 520, 671 A.2d 495 (1996); *see Adamson v. Correctional Med. Servs.,* 359 Md. 238, 251, 753 A.2d 501 (2000). Moreover, under settled principles of statutory construction, the word "shall" is ordinarily presumed to have a mandatory meaning. *See In Re Anthony R.,* 362 Md. 51, 56, 763 A.2d 136 (2000); *In Re Abiagail C.,* 138 Md.App. 570, 581, 772 A.2d 1277 (2001); *Egloff v. County Council of Prince George's County,* 130 Md.App. 113, 130, 744 A.2d 1083 (2000).

As with a statute, we do not read the words of a regulation in isolation. Instead, we read them with reference to the legislative scheme of which they are a part, so as to effectuate the legislative intent. *Mayor & City Council of Balt. City v. Johnson,* 156 Md.App. 569, 592–95, 847 A.2d 1190 (2004), *aff'd* 387 Md. 1, 874 A.2d 439 (2005). "We may also consider the particular problem or problems the legislature was addressing, and the objectives it sought to attain." *Sinai Hosp. of Baltimore, Inc. v. Department of Employment & Training,* 309 Md. 28, 40, 522 A.2d 382 (1987). And, as with a statute, in construing a regulation we aim "to avoid results which are

'illogical,' 'unreasonable,' or 'inconsistent with common sense.'" *Romm v. Flax*, 340 Md. 690, 693, 668 A.2d 1 (1995) (citation omitted).

## IV.

At the time of the first step of the grievance procedure, under the Comptroller's then existing policy, employees traveling to off-site locations were compensated only for travel time that exceeded commuting time by more than one half hour. The Comptroller recognized that the policy denied employees compensation for a period of time that should have been viewed as work time. Accordingly, in a decision issued on September 12, 2003, Miller's grievance was granted, in part; Miller was found entitled to compensation, as work time, for all travel time in excess of the time that she normally spent commuting between home and office.[9]

On September 24, 2003, twelve days after the decision at the first step grievance hearing, the Comptroller changed the work time policy and notified all affected employees. Nevertheless, the ALJ rejected the revised policy, concluding that an employee "is working for the State, 'on the clock,' so to speak, from the time the employee leaves the residence or the place from which the normal commute to the assigned office would begin," until arriving at a field site.

We agree with appellant that the ALJ's conclusion is inconsistent with the plain meaning of the regulations. Therefore, the ALJ's decision is "premised on an erroneous conclusion of law." *Noland*, 386 Md. at 571, 873 A.2d 1145. We explain.

COMAR 17.04.11.02B(I)(j) plainly defines "work time" as the time during which an employee "[t]ravels between home and a work site other than the assigned office, in accordance with the Standard Travel Regulations under COMAR 23.02.01." As noted, Ms. Miller asserts that the plain language of this regulation requires that the employee "be com-

---

9. We have already noted Ms. Miller's normal commute time from her home to 301 Preston Street is "half an hour."

pensated for the *entire* time spent traveling from home to a work site other than the assigned office," without regard to the fact that, but for the travel to an off site location, the employee would have spent some period of time commuting to the assigned office. However, the Standard Travel Regulations under COMAR 23.02.01.01(c)(2) provide: "Reimbursement to employees or officials who use State-owned, State-leased or privately owned motor vehicles to conduct official business for the State is within the jurisdiction of the State Fleet Administrator, Department of Budget and Fiscal Planning [now Department of Budget and Management ("DBM")] *and subject to policies issued by the Secretary . . . . "* (Emphasis added.)

We agree with the Comptroller that it is clear what the "plain language" of COMAR 17.04.11.02B(I)(j) both does and does not do. It does *not* provide that the "entire" home to remote site commute constitutes work time. The language of the regulations does require, by its incorporation by reference of the Standard Travel Regulations, resort to the state fleet policies to determine what is to be considered work time.

It is "well settled that incorporation by reference is a perfectly acceptable and appropriate method of drafting legislation." *Boitnott v. Mayor and City Council of Baltimore,* 356 Md. 226, 242, 738 A.2d 881 (1999); *see also Smith v. Plymouth Locomotive Works, Inc.,* 304 Md. 633, 638–39, 500 A.2d 1027 (1985) ("The authorities uniformly agree that a statute may adopt all or part of another statute by descriptive reference thereto, and when this occurs it is as if the part adopted has been written into the adopting statute").

In *Hanrahan v. Alterman,* 41 Md.App. 71, 396 A.2d 272, *cert. denied,* 284 Md. 744 (1979), we said:

The law recognizes "a special class of related statutes, . . . the relationship [between which] results from the fact that one statute adopts the terms of the other without restating them.[']" Incorporating statutory provisions by reference, partially or entirely, into legislation has been long recog-

nized as an acceptable practice on both the state [] and federal levels [] unless prohibited by constitutional provisions. "The purpose of incorporating, [adopting,] or referring to prior statutes is to avoid encumbering the statute books with useless repetition and unnecessary verbiage."

*Id.* at 81, 396 A.2d 272 (citations omitted).

The regulations set out in the "State Vehicle Fleet Policies and Procedures" manual are incorporated by reference into COMAR 17.04.11.02B(1)(j). To conclude otherwise would defeat the "ordinary and natural meaning" of the words of the statute, *Whack v. State,* 338 Md. at 672, 659 A.2d 1347, taking "a clear and unambiguous statute" and giving it "a forced . . . interpretation in an attempt to extend or limit the statute's meaning." *Taylor v. NationsBank,* 365 Md. at 181, 776 A.2d 645.

Accordingly, the principles outlined above require us to consider the State Fleet policies adopted by the DBM's State Fleet Administrator. As noted, § 5.01.05 of the "State Vehicle Fleet Policies and Procedures" provides, in part:

A state employee who leaves home to conduct business without stopping at the assigned office may be reimbursed for all mileage directly connected with the business trip, *which is in excess of the commute miles normally traveled i.e. total official miles driven minus normal daily commute miles.* In this situation, the driver has not driven his normal daily commute and therefore must subtract it from the total official miles driven.

(Emphasis added.)

The Comptroller has analogized the treatment of an employee's travel time to the treatment of mileage. An employee is entitled to payment for mileage that exceeds the mileage for the daily commute; when driving for State business, the employee is compensated for mileage, minus the mileage that would have been driven for commuting. The Secretary of DBM, who administers both work time and travel reimbursement, has chosen to apply to travel time the policy applicable

for mileage, i.e., awarding compensation for travel time minus normal commuting time.

Although "commute time" is not defined in COMAR 17.04.11.02, "work time" is defined in subsection B. The omission of "commute time" in COMAR 17.04.11.02B, combined with the detailed definition of "work time" in that subsection, logically suggests to us that "commute time" is not tantamount to work time. Additionally, with reference to FSLA, we note that "preliminary activities," as described in the FLSA, are "those activities which are engaged in before the threshold of, or entrance upon the day's principal activity." 29 U.S.C.A. § 254(a)(2); *see also Bagrowski v. Maryland Port Authority*, 845 F.Supp. 1116 (D.Md.1994); *Marshall v. Gerwill, Inc.*, 495 F.Supp. 744 (D.Md.1980).

We are persuaded by appellant's contention that commuting is "preliminary to or postliminary to" appellee's principal activity, and therefore it is not compensable under the Portal–to–Portal Act of 1947, 29 U.S.C. § 254(a). It relieved employers from "liability or punishment under the Fair Labor Standards Act of 1938" for failing to pay an employee for the following activities:

(1) walking, riding, or traveling to and from the actual place of performance of the principal activity or activities which such employee is employed to perform, and

(2) activities which are preliminary to or postliminary to said principal activity or activities, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such principal activity or activities.

Maryland law accommodates the FLSA's exclusion of commuting time as compensable. As appellee correctly points out, "there are circumstances in which state law goes beyond the FLSA, as recognized by the General Assembly when it explicitly stated that state employees are entitled to the greater of that which they are afforded by state or federal law." The FLSA is a floor, not a ceiling.

COMAR 17.04.11.02B explicitly contemplates compensation for State employees for certain preliminary and postliminary activities, granting the employee the time in excess of daily, normal commute time when an employee "[t]ravels between home and a work site other than the assigned office." COMAR 17.04.11.02B(j). Conversely, when an employee travels off site, the provision does not provide for compensation for the time that would have been spent for the daily, normal commute.

Under appellee's analysis, an employee assigned to a remote work site that requires less travel time than the normal, daily commute would have a shorter work day, yet earn compensation in excess of a full day's pay. Compensating employees for their entire travel time to a remote work site, without consideration of regular commute time, would lead to unjust enrichment of the employee, who would ordinarily have spent a portion of that time traveling to the regular work site. Commute time is not work time, and an employee who is on travel status is not entitled to compensation for either the mileage or the time that the employee regularly spends to commute. We decline to endorse a facially absurd result that is blatantly unfair to the taxpayers and results in a windfall to the employee.

We pause to review the Court of Appeals's recent opinion in *Palmer, supra,* 389 Md. 443, 886 A.2d 554, which is facially similar but distinguishable on its facts. In *Palmer,* non-uniformed employees at the Eastern Correctional Institution ("ECI") grieved, *inter alia,* that ECI's "security search policy ... required them to use personal leave time to undergo searches and related delays while entering and exiting the Institution." *Id.* at 444, 886 A.2d 554. The grievants were unsuccessful before the Warden, the Secretary of the Department of Public Safety and Correctional Services (the "Department"), and the Secretary of Budget and Management (the "Secretary"). *Id.* The Secretary referred the grievance to the OAH, where the ALJ construed the "work time" regulations in favor of the grievants. *Id.*

The ALJ's decision rested on the ALJ's construction of COMAR § 17.04.11.02B(1)(g), which states that "[w]ork time includes time during which the employee ... participates in activities that are job-related immediately before the beginning or immediately after the end of an assigned shift...." *Id.* at 448, 886 A.2d 554. The ALJ concluded that the time spent clearing security constituted a job-related activity under CO-MAR 17.04.11.02B(1)(g), citing the following reasons: "the requirement ... is a pre-requisite to the [e]mployee's commencement of and completion of the work day"; "it cannot be accomplished off-site, on the employee's own time"; "this pre-requisite is mandated by Management"; while waiting, "employees are subject to Management's assignment and supervision"; and "the time it takes ... to undergo security can be unduly delayed by Management activities such as a lock-down, or entry of inmates into the institution or unavailability of a female officer." *Id.* at 449, 886 A.2d 554. The ALJ's decision was upheld on judicial review by the Circuit Court for Somerset County. *Id.*

In the Court of Appeals, the Court noted that "the issue raised is whether the time spent in clearing security is part of the Grievants' work time." *Id.* at 448, 886 A.2d 554. The Grievants did "not contest the requirement that they clear security." *Id.* at 447, 886 A.2d 554. They sought "to punch in before, and out after, they have cleared security, so that they will not be charged personal leave time if they do not arrive at their work stations by the start of a shift or if they leave their work stations before the end of a shift." *Id.* at 447–48, 886 A.2d 554.

The Court observed that the ALJ "carefully limited the Grievants' work time to the scope of COMAR 17.04.11.02B(1)(g), holding that time spent clearing security checks was 'job-related' only when entering or exiting a shift." *Id.* Holding that the ALJ's decision "was not premised upon an erroneous conclusion of law," the Court noted first that the ALJ's determination was "entitled to a degree of deference described as 'considerable weight.'" *Id.* at 453, 886 A.2d 554 (citing *Noland,* 386 Md. at 572, 873 A.2d 1145). Second, the

Court held that the ALJ's decision "is supported by ordinary rules of statutory construction." *Id.* at 454, 873 A.2d 1145. The Court stated: "By the plain language of [COMAR 17.04.11.02B(1)(g)], the activity need only be job-related, and the ALJ gave explanations that are reasonable and hardly arbitrary for concluding that the security clearance activity in the instant matter was job-related." *Id.*

*Palmer* involved activities that occurred once the employee arrived at their regular work site. In contrast, the case *sub judice* involves travel to and from a remote work site, and does not implicate a requirement that an employee use his or her personal time, without compensation, while engaged in a work-related activity. Under the Comptroller's revised travel policy, Miller is compensated for time that exceeds normal, daily commute time. While travel to an off-site work location "is mandated by Management," *id.,* she is compensated for time that exceeds her own normal commute time.

As we see it, the ALJ's interpretation was premised on the erroneous conclusion that existing regulations mandated that an employee's entire commute between home and a remote work site be treated as work time. The ALJ ignored the incorporation by reference of the Standard Travel Regulations into COMAR 17.04.11.02B(1)(j). The ALJ also ignored the scenario in which travel to a remote work site takes less time than travel to an assigned office; in that instance, the ALJ's erroneous interpretation of the regulations would create a windfall for the employee. The Comptroller's interpretation, in our view, mirrors the DBM's travel regulations and avoids that unreasonable result.

## V.

We agree that appellee is entitled to the award of compensation as provided in Cordi's "Management Decision" of November 12, 2003. That decision modified the August 7, 2003, first step grievance decision "to conform with the 20–day

requirement of [S.P.P.] Section 12–203(b)." [10]

As we indicated earlier, appellee sought compensation dating back to the commencement of her employment with the Comptroller in 2001. But, there is no authority to support appellee's claim for such an award.

Appellee filed her grievance on August 7, 2003, making it applicable for all acts occurring within the previous twenty days. Consistent with the Comptroller's revised work time policy, appellee's remedy is statutorily limited under S.P.P. § 12–203(b) to the period beginning July 19, 2003, *i.e.*, twenty days prior to the filing of her grievance, until September 24, 2003, the effective date of the Comptroller's revised work time policy.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY WITH INSTRUCTIONS TO REMAND TO THE OFFICE OF ADMINISTRATIVE HEARINGS. COSTS TO BE PAID BY APPELLEE.**

---

10.  As we have already noted, S.P.P. § 12–203(b) states:
   (b) *Time limitations.*—A grievance procedure must be initiated by an employee within 20 days after:
   (1) the occurrence of the alleged act that is the basis of the grievance; or
   (2) the employee first knew of or reasonably should have known of the alleged act that is the basis of the grievance.